The **SHERWIN–WILLIAMS COMPANY, et al.,** Plaintiffs,

v.

**CITY AND COUNTY OF SAN FRANCISCO, Defendant.**

No. C–93–4179 WHO.

United States District Court, N.D. California.

July 14, 1994.

Thomas G. Dent, Lawrence E. Butler, Cynthia A. Cohan, Seyfarth, Shaw, Fairweather & Geraldson, San Francisco, CA, for plaintiffs.

Louise H. Renne, City Atty., Burk E. Delventhal, G. Scott Emblidge, Julia M.C. Friedlander, David Greenburg, Deputy City Attys., San Francisco, CA, for defendant.

## OPINION AND ORDER

ORRICK, District Judge.

Graffiti vandalism—the outrageous scarring of real property both public and private with unintelligible markings made by irresponsible persons—plagues San Francisco as it does other cities in the United States and Europe. Many of these cities have attempted to curb this thoughtless despoiling of property by laws called "lock-up" laws. San Francisco has adopted a form of "lock-up" law by enacting an ordinance making it illegal for retailers to display for sale markers or spray paint unless they are maintained in

places accessible only with employee assistance.

Plaintiffs The Sherwin–Williams Company, Plasti–Kote, Inc., Tru–Test Manufacturing Company, Aervoe–Pacific, Inc., Western Aerosol Information Bureau, AptarGroup, Inc., Seymour of Sycamore and Center Hardware and Supply (collectively, "Plaintiffs") have moved this Court to permanently enjoin defendant, the City and County of San Francisco, from enforcing San Francisco Ordinance No. 333–93. A preliminary injunction was entered in this matter on December 6, 1993, and a trial was held February 28 through March 3, 1994. Witness testimony was supplemented by voluminous written testimony submitted during the post-trial briefing stage which concluded on March 28, 1994. For the reasons set forth in this Opinion and Order, which constitutes the Court's findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure, the Court **DENIES** plaintiffs' motion for a permanent injunction and vacates the order granting the preliminary injunction.

## I.

### A.

### *SAN FRANCISCO ORDINANCE NO. 333–93*

In the Fall of 1993, and in response to the continuing and growing plague of graffiti in San Francisco, Supervisor Annemarie Conroy announced her "Blueprint for Battling Graffiti in San Francisco—'Zero Tolerance'", a comprehensive graffiti control program. On October 25, 1993, the San Francisco Board of Supervisors approved one aspect of the Blueprint, Article 42, Chapter VIII of the San Francisco Police Code, which makes it unlawful for retail commercial establishments in San Francisco to store or display spray paint or marker pens ("markers") in an area that is accessible to the public without employee assistance. (Stipulation of Undisputed Facts ("SUF") ¶ 13.) On October 29, 1993, Mayor Frank Jordan approved Article 42, designated as San Francisco Ordinance No. 333–93 ("Ordinance").

The Ordinance provides:

Be it ordained by the people of the City and County of San Francisco that:

Section 1. Chapter VIII of the San Francisco Municipal Code (Police Code) is hereby amended by adding a new Article 42 thereto reading as follows:

### ARTICLE 42

Sale and Display of Spray Paint and Marker Pens

\*     \*     \*     \*     \*     \*

Section 4201. STORAGE AND DISPLAY OF AEROSOL PAINT CONTAINERS AND MARKER PENS.

(a) It shall be unlawful for any person who owns, conducts, operates or manages a retail commercial establishment where aerosol paint containers or marker pens are sold to store or display, or cause to be stored or displayed, such spray paint containers and marker pens in an area that is accessible to the public without employee assistance in the regular course of business pending legal sale or other disposition.

(b) Nothing herein shall preclude the storage or display of spray paint containers and marker pens in an area viewable by the public so long as such items are not accessible to the public without employee assistance.

The Ordinance was intended to reduce the amount of graffiti damage in San Francisco which both sides agree is pervasive throughout the City. (SUF ¶¶ 4, 5, 27; Conroy Decl. ¶ 3, 5; City Ex. B). Faced with similar graffiti epidemics, dozens of California cities and cities throughout the United States have enacted similar laws in recent years. Such laws are known as "lock-up" laws.

### B.

### *THE PARTIES*

Plaintiff The Sherwin–Williams Company ("Sherwin–Williams") is an Ohio corporation, with its principal offices in Ohio. Sherwin–Williams manufactures spray paint products in California, Ohio, Michigan and Illinois, and its products are made of component parts which are obtained from sources inside and

outside California and which move in interstate commerce. Sherwin–Williams directly sells its spray paint products through its own retail store in San Francisco. Sherwin–Williams also sells its spray paint products through distributors in San Francisco.

Plaintiff Tru–Test Manufacturing Company ("Tru–Test") is a Delaware corporation, with its principal offices in Cary, Illinois. Tru–Test sells its spray paint products through distributors in San Francisco and elsewhere in interstate commerce. Tru–Test's spray paint products are sold by numerous retail commercial establishments in San Francisco, including individually owned True–Value hardware stores which are members of the cooperative that collectively owns Tru–Test.

Plaintiff Center Hardware ("Center") is a California corporation, with its principal offices in San Francisco, California. Center operates as a retail commercial establishment in San Francisco. Center sells building products, hardware, a wide variety of aerosol products, including spray paint, and other products consumers typically buy from a hardware store. Center also sells markers with a tip larger than 4 mm.

Plaintiff Plasti–Kote, Inc. also manufactures spray paint. Seymour of Sycamore, AptarGroup, Inc., Aervoe–Pacific and Western Aerosol Information Bureau are also plaintiffs in the action.

Defendant City and County of San Francisco ("the City" or San Francisco) exists under the laws of California, and its ordinances are enacted by the Board of Supervisors, subject to the approval of the Mayor of San Francisco. (SUF ¶ 15).

**C.**

### GRAFFITI PERPETRATORS AND THEIR MOTIVATIONS

"Graffiti" refers to an inscription, drawing or design, scratched, painted, sprayed or placed on a surface, without the consent of the owner, so as to be seen by the public. (SUF ¶ 27). Graffiti vandals come from all racial, ethnic and socioeconomic backgrounds and the majority of persons who commit graffiti vandalism in San Francisco reside in the City. (SUF ¶¶ 6, 7). Testimony at trial revealed that three distinct groups cause graffiti vandalism in San Francisco: hip hop graffiti writers, gang members and miscellaneous groups. (Tr. (DB) 37:21–38:1; SUF ¶ 43). Each is discussed in turn below.

#### 1. *Hip Hop Graffiti*

Hip hop graffiti[1] is part of the hip hop culture, which also includes certain styles of music, dress and other components. (Pl.Ex. 40; Tr. (DB) 3:22–25, 4:21–6:12).

#### a. *Types of Hip Hop Graffiti*

There are three types of hip hop graffiti: tags, throw-ups and pieces. (Pl.Ex. 40; Tr. (DB) 7:14–17; Tr. (RL) 95:24–96:5). Tags are stylized signatures of a writer's chosen street name. (SUF ¶ 30; Tr. (DB) 9:5–24). Throw-ups are larger names or figures written in bubble style, often with an outline written in a different color than the interior of the letters. (SUF ¶ 31; Tr. (DB) 12:7–10, 13:1–8).

"Pieces"—short for masterpiece—are the most elaborate type of hip hop graffiti. (SUF ¶ 32; Tr. (DB) 13:9–16). Pieces are detailed, multi-colored murals that range in size, although they are typically larger than

---

1. Plaintiffs presented two expert witnesses in the area of hip hop graffiti, Devon Brewer and Rick Llamas. Mr. Brewer has completed the Ph.D. program in Social Networks at the University of California–Irvine. During the course of his studies, he has extensively studied and written on the subject of graffiti and who produces it. Specifically, Mr. Brewer has studied the hip hop culture since 1987 in various cities, including New York, Seattle, Portland, Los Angeles and San Francisco. He has also published two peer-reviewed articles on the subject in leading human behavioral journals.

Mr. Llamas is a nineteen-year old hip hop graffiti writer from Los Angeles who has been active in the hip hop graffiti culture for the last ten years. Like most graffiti writers, Mr. Llamas began his "career" as a tagger, but has progressed to elite writer status and now produces strictly legal pieces. At the height of his tagging, Mr. Llamas held the title "All City" for the city of Belle Gardens for an entire year, signifying that his tag was "up" and sustained in more locations than any other tagger in the city.

tags and throw-ups and may cover an entire building wall. (SUF ¶¶ 33, 34; Tr. (DB) 13:9–25, 14). Of the three types of hip hop graffiti, tags are by far the most common. According to one expert's rough estimate, there are approximately 100 times as many tags in San Francisco as throw-ups or pieces. (Tr. (DB) 38:14–21).

### b. *Social Organization of the Hip Hop Culture*

The social organization of the hip hop culture includes "classes" and "crews." (Pl.Ex. 40). "Classes" refer to two loosely identifiable groups of hip hop graffiti writers: taggers and elite writers. (Pl.Ex. 40; Tr. (DB) 36:12–23). Writers begin as taggers, concentrating on the writing of tags and throw-ups. (Pl.Ex. 40; Tr. (DB) 26:3–14). Approximately 85% of San Francisco's graffiti is caused by taggers. (SUF ¶ 42). After developing their skills, taggers move onto pieces and those few writers who achieve significant fame through the execution of respected pieces become known as "elite writers." (Pl. Ex. 40; Tr. (DB) 26:3–14).

Taggers may work alone or in groups referred to as "crews." (SUF ¶ 46). "Crews" are groups of friends who write graffiti together and share materials and skills. (Pl. Ex. 40; Tr. (RL) 79:23–80:3; Tr. (S–J) 50:12–18; SUF ¶ 46). When tagging, members of crews often write their crew tag as well as their individual tag. (SUF ¶ 47). While many crews are local, there are some large crews with members located from San Francisco to Los Angeles and beyond. (SUF ¶ 49). In addition, some crews may specialize in particular targets. (SUF ¶ 50). For example, San Francisco has "yard crews" that specialize in tagging Municipal Railway vehicles in the MUNI yards. (SUF ¶ 51). Individual taggers and tag crews engage in "battles" in which the object is to commit as much graffiti vandalism as possible within a defined area and defined time period. (SUF ¶ 52; Tr. (RL) 84:21–85:10).

### c. *Characteristics of Hip Hop Graffiti Writers*

Hip hop graffiti writers are overwhelmingly male. (SUF ¶ 35). They tend to be teenagers, ranging in age from 12 to 20, although some writers begin earlier and some writers continue through their 20s and even 30s. (SUF ¶ 36). Writers come from all racial, ethnic and social backgrounds and are highly mobile. (SUF ¶ 6).

### d. *Primary Values of Hip Hop Graffiti Writers*

Hip hop graffiti writers share two primary values: fame and, to a lesser extent, artistic expression. (Pl.Ex. 40; Tr. (DB) 22:6–23:11). These values help to explain the commitment to graffiti that many writers hold. (*Id.*).

Taggers seek fame through their tagging activities and by competing with each other to obtain status. (SUF ¶¶ 40, 44). Three factors are important to achieving fame: (1) quality of work; (2) quantity of work; and (3) the risk involved in applying the graffiti. (Pl.Ex. 40; Tr. (DB) 22:9–24:2). To develop high quality work, dedicated writers practice. (Pl.Ex. 40; Tr. (DB) 23:5–11). They also learn skills from other writers as well as from books, magazines and newsletters devoted to hip hop graffiti. (Pl.Ex. 40; Pl.Exs. 17, 22, 33).

Quantity, however, is the most important ingredient to achieving fame. (Tr. (DB) 22:14–23:4; Tr. (RL) 82:1–25). The motivation of a tagger is to write his name on as many surfaces as possible. (SUF ¶ 37; Tr. (RL) 82:4–11). Another important aspect to quantity is the duration in which a particular tag stays in place. (Tr. (RL) 99:17–100:6; Pl.Exs. 98–105).

Finally, graffiti is more highly valued if its application required the writer to experience risk or danger, for instance, that written on the "third rail" of the subway or across a highway sign. (Pl.Ex. 40; Tr. (RL) 82:22–83:4; Tr. (DB) 23:19–25). Indeed, some very dedicated graffiti writers are willing to risk their lives to apply graffiti in a dangerous, and thus prestigious, location. (Tr. (RL) 83:1–6). The second primary value, artistic expression, refers to the artistic value attributed to graffiti and is based on its style, originality and the technique used to create it. (Pl.Ex. 40; Tr. (DB) 23:5–11; Tr. (RL) 82:12–19; 84:3–11).

Writers also share two secondary values: (1) power; and (2) rebellion. (Pl.Ex. 40; Tr. (DB) 24:10–25:30). Writers obtain a sense of individual power by controlling various surfaces with their name. (Pl.Ex. 40; Tr. (DB) 24:10–16). Writers experience collective power by belonging to a culture. (Pl.Ex. 40; Tr. (DB) 24:10, 17–25:2). Finally, rebellion is achieved by writing graffiti because, in doing so, the writer violates conventional societal norms. (Pl.Ex. 40; Tr. (DB) 25:3–20; Tr. (S–J) 54:8–16). Indeed, many writers thrive on the push and pull with authorities that is inherent to graffiti writing. (Tr. (DB) 33:7–15; Pl.Ex. 153 (Haggett Dep.) 38:6–39:6).

Although each of the four values just discussed is shared, to some extent, by all taggers, both parties agree that there are different levels of commitment and experience within the tagging community. (SUF ¶ 45). For "hard core" taggers, who comprise approximately 10% of the tagging population, committing graffiti is the central focus of their lives. (Pl.Ex. 40; Tr. (RL) 98:17–99:3). For example, a "247" is a 24 hours a day, seven days a week tagger and because of their commitment, "247s" as a group are responsible for a large percentage of graffiti in any given city. (SUF ¶ 39; Tr. (RL) 98:6–21).

At the same time, however, testimony revealed that 80 to 85% of graffiti vandals never progress to doing pieces and only 20 to 25% of graffiti writers in San Francisco have been writing for more than a year. (Tr. (DB) 39:14–19, 43:7–15). These figures reveal the volatility of the tagging population. Testimony also revealed that, in contrast to the dedication and planning exhibited by hard core taggers, many taggers are opportunists who put their tags up on the spur of the moment with little or no planning. (Stokes Decl. ¶ 11; Beswick Dep. 158:24–159:20).

### 2. Gang Graffiti [2]

Gang graffiti accounts for approximately 10% of the graffiti in San Francisco and is distinct in both style and purpose from hip hop graffiti. (Tr. (S–J) 51:15–20). Gangs use graffiti to mark territory and eulogize their dead. (Tr. (S–J) 45:7–25, 46:1–10; SUF ¶ 53). In most instances, graffiti is specifically placed under the direction of gang leaders and is normally not created in a random manner. (Tr. (S–J) 45:10–46:6–9).

### 3. Miscellaneous Graffiti

Finally, miscellaneous groups write graffiti consisting of general messages, such as "John loves Mary", racial slurs or political statements. (Pl.Ex. 40; Tr. (DB) 37:21–38:1). Miscellaneous graffiti likely accounts for approximately 5% of all graffiti in San Francisco.

### D.

### *DETERRENT EFFECT OF THE ORDINANCE*

While the parties largely agreed upon the identity of the major perpetrators of graffiti in San Francisco and their motivations, they were sharply divided on the issue of whether the Ordinance would achieve its objective of reducing graffiti. The debate over this issue was animated by competing opinions from experts and others, and centered around the extent to which the availability of other sources of spray paint and markers, and substitute graffiti tools would undermine the Ordinance's desired deterrent effect.

Before focusing on the areas of discord, however, it is worthwhile to highlight two corresponding facts upon which witnesses for both sides agreed: (1) the high frequency with which taggers shoplift spray paint and markers and (2) the fact that taggers favor these two items above all other graffiti tools.

### 1. The Phenomenon of Racking

Individuals under the age of 18 are prohibited by state and local laws from purchasing spray paint and markers. (Cal.Penal Code § 594.1(b); San Francisco Police Code §§ 554(a), 555). As a result, minor graffiti

---

**2.** Plaintiffs presented one expert witness, Martin Sanchez–Jankowski, to discuss gang graffiti. Dr. Sanchez–Jankowski is an Associate Professor of Sociology at the University of California–Berke-ley. His extensive sociological studies into the nature and activities of youth street gangs has included gangs' use of graffiti to communicate.

vandals frequently turn to theft to acquire the spray paint and markers they use to tag.

Although the estimates provided at trial varied from a low range of 10% to 50% to a high of 80%, every witness who testified on the subject agreed that taggers frequently shoplift the spray paint that they use to commit graffiti vandalism. Indeed, the practice is so common that taggers have created fanciful terms to describe it, including "racking" and, to a lesser extent, "mobbing." "Racking" occurs when a group of taggers enter a hardware store; some set out to distract the sales clerk, while others place as many cans of spray paint as possible into their clothing or knapsacks before fleeing. (Shafer Decl. ¶ 9; Tr. (RL) 131:2–8).

Although he opined that lock-up laws do not deter graffiti, Rick Llamas, the plaintiffs' expert tagger, conceded that his tag name, "Nerv", was derived from the fact that he was too nervous to rack with the rest of his friends and often remained outside while they went into a store to shoplift. (Tr. (RL) 141:22–142:4; *see also* Shafer Dep. 104:12–18). In addition, he testified that most of the markers he used during his tagging days were stolen. (Tr. (RL) 143:19–25). All of the police officers and the two academic experts who testified agreed that taggers frequently obtain their spray paint through shoplifting. Finally, San Francisco retailers, as well as retailers from Southern California, confirmed that they had experienced spray paint theft by taggers in their stores. (Cornell Decl. ¶ 3; Tr. (JT) 8:15–9:2; 24:16–19; Curtin Decl. ¶ 7; Thomson Dep. 108:7–9, 115:3–12, 150:11–151:23).[3]

Given the wealth of evidence that shoplifted spray paint constitutes a primary source of paint for taggers, it is not surprising that the Board of Supervisors felt that restricting access to spray paint in a manner that curtails the likelihood of theft could help to reduce graffiti.

### 2. Popularity of Spray Paint and Markers

Next, all of the witnesses who testified on the subject agreed that spray paint and markers are the most popular graffiti tools. The two taggers, Llamas and Ezra Shafer, testified that although they used other materials, spray paint and markers were their two primary and preferred tools in writing graffiti. (Tr. (RL) 143:19–25; Shafer Dep. 146:24–147:6).). Indeed, Shafer testified that 90% of the tags he produced were done with spray paint. (Shafer Dep. 101:21–24). Taggers favor spray paint, in part, because it comes in a variety of colors, can be applied quickly with different sized nozzles and dries fast. (Mulroney Decl. ¶ 14). Each of the police officers who testified agreed that spray paint and markers were the two most commonly used graffiti implements, with spray paint the clear favorite. (Tr. (KM) 24:4–23; Stokes Decl. ¶ 7).

Finally, the testimony of the taggers and police officers regarding taggers' preference for spray paint and markers was confirmed by the academic experts and others who have been involved in community efforts to curtail graffiti. (Tr. (DB) 40:16–25; Mann Dep. 33:1–5, 90:22–91:5).

As a whole, then, the testimony concerning the wide use of spray paint and markers by taggers and the frequency with which they are shoplifted provides a strong justification for the Ordinance which clearly will reduce theft of these items by requiring retailers to display them so that they cannot be accessed without employee assistance. Plaintiffs attempted to counter this testimony by providing information regarding the wide availability of alternative sources of spray paint and markers and the wide availability of substitute graffiti tools.

### 3. Availability of Alternative Sources

Testimony at trial revealed that there are several alternative sources of spray paint and markers upon which graffiti vandals could rely if the Ordinance restricted their ability to shoplift these items.

---

**3.** It was undisputed that every can of spray paint that a tagger steals from a retailer causes a loss to the retailer. Conversely, theft at the retail level does not result in any direct financial loss to paint manufacturers because it is the industry's practice not to reimburse retailers for theft of paint products. (Tr. (JT) 35:18–21; Tr. (JS) 38:9–12).

First, although individuals under the age of 18 are prohibited from purchasing spray paint and markers by state and local law, they may obtain spray paint and markers by either taking them from adults who have purchased them or having adults purchase them on their behalf. (Tr. (DB) 30:18–24; Tr. (RL) 130:2–11, 152:10–153:2; Shaffer Dep. 108:8–22; Pl.Ex. 175 (Beswick Dep.) 293:21–294:4). In addition, testimony revealed that most markers used by graffiti vandals are easily refillable and, consequently, one marker can last indefinitely. (Tr. (RL) 126:3–127:15; 115:11–116:12).

Next, evidence suggested that there is an underground market in the Bay Area where underage taggers and gang members can purchase spray paint and markers in violation of state and local law. Dr. Sanchez-Jankowski testified that in his estimation the underground market would grow if demand for these items increases as a result of the Ordinance eliminating a common source for them. (Tr. (S–J) 54:17–20). In addition, taggers of any age may purchase spray paint and markers via mail order and plaintiffs exhibited to the Court one hip hop magazine that contained several advertisements for mail order paint suppliers.

Finally, graffiti vandals who have the desire to do so could travel to communities near San Francisco that do not have lock-up laws and continue to rack spray paint and markers.

While the Court does not doubt that these alternative sources exist, it notes that three of the four require the graffiti vandal to pay for the items, which obviously results in an increase in the "cost of doing business" for a tagger who customarily shoplifted some or all of his supplies in the past. Mr. Llamas testified that the main reason vandals shoplift their spray paint and markers is because they do not have the money to buy them. (Tr. (RL) 142:8–10). In addition, although he touted mail-order as a viable alternative source of spray paint, he also conceded that neither he nor his friends had ever acquired spray paint through the mail. (Tr. (RL) 143:7–18). Finally, although the last alternative—racking in nearby communities without lock-up laws—allows taggers to continue to shoplift, it certainly demands more time and effort than is required in walking to the neighborhood store to do so.

### 4. Availability of Substitute Materials

Testimony at trial revealed that hip hop graffiti vandals currently utilize a wide variety of media to commit graffiti. (Pl.Exs. 81–115; 116–138; 140; Tr. (DB) 21:16–22:1, Tr. (RL) 124:17–23, 129:2–22, 100:5–9, 101:16–17, 113:17–23). Virtually any device, tool or instrument capable of leaving a mark on a surface may be used to produce graffiti.

Graffiti vandals currently use rollers, brushes, crayons, stamp pads, paint sticks, shoe polish, and bottles, balloons and other homemade devices in which any kind of liquid, paint or ink can be poured and used to create graffiti. (Tr. (RL) 113:24–128:7; Stokes Dec. ¶ 11; Pl.Exs. 106–107, 111–115, 116–117). In addition, underage taggers are currently able to purchase many aerosol products which are applied like spray paint, including: automotive undercoats, automotive primers, disc brake silencer, gasket adhesive, gasket dressing sealant, battery protector, tree wound dressing and spray-on hair color. (Tr. (RL) 101:18–110:9; Pl.Exs. 81–96).

Finally, and in addition to devices capable of spraying or applying liquids, graffiti vandals use any number of implements to mark, gouge or etch a surface and place self-adhesive labels on surfaces, or mark surfaces using brushes, sponges, rags or other means. (SUF ¶ 28).

The Ordinance does not cover the sales of these items which are all substitutes for spray paint and markers and are readily available for purchase at San Francisco retail stores. (SUF ¶ 14; Tr. (RL) 101:18–110:9; 124:17–23; Pl.Exs. 97–140).

### 5. Projected Impact of Ordinance

Although the testimony at trial clearly established that spray paint and markers are graffiti vandals' tools of choice and that they frequently obtain them through shoplifting, it sharply conflicted over the ultimate issue of whether the Ordinance would work.

Plaintiffs presented a unified front on this topic. Their three primary witnesses on the issue argued that the Ordinance would be greatly undermined by the high level of commitment that many taggers share and by the wide availability of alternative graffiti tools and alternative sources of spray paint and markers. For these two reasons, Llamas predicted that the Ordinance would have no impact on graffiti vandalism. Devon Brewer concurred in his assessment, noting that the Ordinance would have "no or [a] negligible impact." (Tr. (DB) 29:20–30:3).

Finally, Professor Sanchez–Jankowski agreed that the Ordinance would not reduce gang graffiti or the graffiti produced by the most dedicated taggers, such as "247s." (Tr. (S–J) 55:3–57:3). He conceded, however, that the Ordinance "would have a minimal effect" on tagger graffiti because

> you have some people who would stop, but usually, in my judgment, the people who would stop would be the people who were less committed in the first place to do it. . . . So when I say minimum effect, I could imagine some very small number of people who are less committed or noncommitted [sic] at all dropping off and not doing it anymore, but people that are very committed wouldn't.

(Tr. (S–J) 56:18–57:3).[4] Professor Sanchez–Jankowski's conclusion was supported by another of plaintiffs' witnesses who has been active with graffiti eradication efforts in her community. (Mann Dep. 108:19–109:10).

The City's evidence in this area was more segmented. First, it presented testimony from two retailers who revealed that restricting public access to spray paint reduces theft. (Tr. (JT) 10:4–4; Thomson Dep. 150:11–151:23). Additional retailers testified

to a similar result with regard to other products they had locked-up in their stores. (Goodman Trial Testimony). Next, the City presented ample testimony that graffiti vandals prefer spray paint and markers to other available graffiti tools and frequently obtain these items through shoplifting. (Shafer Dep. 101:21–102:2; 104:12–18; Tr. (RL) 143:19–25; Cornell Decl. ¶ 3; Curtin Decl. ¶ 7; Tr. (KM) 24:4–23; Mann Dep. 33:1–5).

Finally, the City presented witnesses from two Southern California towns operating under lock-up laws who discussed the contribution that the laws had made in their communities.[5] One witness, Aileen Araki of Gardena, California, organized a neighborhood watch in her area to combat the graffiti problem that her neighborhood confronted. The first thing the watch group did was secure a city-wide ban on the sale of spray paint at local "swap meets." Ms. Araki testified that prior to the ban, she routinely found spray paint caps and empty cans on the ground at the exit of the swap meet near her home.[6] Araki testified that she noticed a marked decrease in graffiti—estimated at 50%—immediately after the ban took effect.[7] (Araki Decl. ¶ 7).

In addition, she noted that after Home Depot voluntarily locked-up its spray paint displays in early 1993, she observed another significant decrease in graffiti in her neighborhood. (Araki Decl. ¶ 7). Based on these personal observations, Araki is convinced that restricting access to paint in a manner that curtails theft helps to reduce graffiti.

Next, Officer Ken Mulroney, a detective with the Gardena Police Department and that city's first graffiti investigator, testified that graffiti vandalism in Gardena has dropped 60–70% since the institution of a

4. Both Drs. Brewer and Sanchez–Jankowski stated that they had never studied the impact of a lock-up law in a city operating under one.

5. The Court found largely irrelevant the testimony presented on Glendale's experience because its ordinance restricts access to a much broader category of aerosol products than the City's Ordinance. As such, it includes within its scope many substitute products that would still be available for purchase by minors under the terms of the Ordinance in question.

6. During his testimony, Llamas confirmed that he frequently stole markers and spray paint at swap meets where they were displayed openly and could be stolen with relative ease. (Tr. (RL) 143:9–25).

7. Plaintiffs' argument that Araki's testimony is irrelevant because San Francisco does not have swap meets is meritless. Araki's personal experience demonstrates that a restriction on free access to spray paint led to a reduction in graffiti in her neighborhood.

multi-pronged effort to combat graffiti, of which locking-up spray paint and markers is just one component. (Mulroney Decl. ¶ 16). Although he could not isolate the contribution that the lock-up law has made in reducing graffiti in relation to other measures, he was confident that it had helped and based his conclusion, in part, on discussions with taggers who have told him that they tag less now that spray paint is harder to shoplift. (Mulroney Decl. ¶ 16).

Finally, the testimony of taggers Llamas and Shafer confirmed that spray paint and markers have become harder to shoplift as a result of retailers heightened awareness that taggers steal these items. (Tr. (RL) 142:11–24; Shafer Dep. 102:13–103:9).

Overall, the testimony concerning the Ordinance's efficacy revealed that while it would not provide a cure to the blight of graffiti, it would at least provide one reasonable measure toward reducing the amount that is produced. Indeed, to find that the Ordinance would have no impact, the Court would have to conclude that every bit of graffiti that is currently created with shoplifted spray paint and markers—a considerable amount given the resounding testimony regarding taggers' preference for these tools and the frequency with which they shoplift them—would be replaced by graffiti produced with spray paint and markers obtained from other sources or with other implements altogether. This, the Court cannot do.

In addition, plaintiffs' expert testimony in this regard focused on the response of "247s" and other elite writers to the Ordinance. But not all graffiti vandals are equally committed, and while the highly committed ones may produce the majority of graffiti that mars this City, they do not produce all of it. Although the Ordinance may not stem the determination of truly dedicated vandals, the evidence suggested that less committed taggers, particularly those just beginning the practice, may well be deterred if a primary source of spray paint and markers is eliminated. (Tr. (S–J) 56:18–57:3; Mann Dep. 109:5–10; Mulroney Decl. ¶ 11; Bestwick Dep. 158:22–159:18). Although substitute products are available, the evidence was clear that spray paint and markers are a tagger's

tools of choice and that taggers use substitute materials infrequently. (Tr. (RL) 161:22–162:11).

## II.

The plaintiffs have raised six constitutional challenges to the Ordinance, each of which is discussed in turn below.

### A.

### COMMERCE CLAUSE

■ The commerce clause specifically grants Congress the power "[t]o regulate Commerce ... among the several States." U.S. Const. Art. I, § 8, cl. 3. The "dormant" component of the clause prevents states and local governing bodies from impeding the flow of interstate commerce, even absent congressional action in a particular field. *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources,* —— U.S. ——, ——, 112 S.Ct. 2019, 2023, 119 L.Ed.2d 139 (1992).

■ A local ordinance prompts scrutiny under the commerce clause in one of two ways: (1) when the Ordinance "affirmatively discriminates," either on its face or in practical effect, against interstate commerce, or (2) when the Ordinance regulates evenhandedly but incidentally burdens interstate commerce. *Hass v. Oregon State Bar,* 883 F.2d 1453, 1462 (9th Cir.1989) (citing *Maine v. Taylor,* 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986)), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1812, 108 L.Ed.2d 942 (1990).

■ Ordinances falling within the first category are subject to exacting judicial scrutiny and will be upheld only if the governing body demonstrates "both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Maine,* 477 U.S. at 138, 106 S.Ct. at 2447 (quoting *Hughes v. Oklahoma,* 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979)). Within the context of this first category, "'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and

burdens the latter." *Oregon Waste Sys., Inc. v. Department of Envtl. Quality,* —— U.S. ——, ——, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994). If an ordinance discriminates against interstate commerce, it is virtually per se invalid. *C & A Carbone v. Town of Clarkstown,* —— U.S. ——, ——, 114 S.Ct. 1677, 1683, 128 L.Ed.2d 399 (1994).

In contrast, ordinances falling within the second category are permissible unless "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

■ The Ordinance at issue here clearly falls within the second category described above. It applies evenhandedly to all spray paint and marker retailers within the City and to both in-state and out-of-state manufacturers of these products. Unlike other laws that the Supreme Court has struck down as violative of the commerce clause, the Ordinance does not have as its object "local economic protectionism ... that would excite those jealousies and retaliatory measures that the Constitution was designed to prevent." *C & A Carbone,* —— U.S. ——, ——, 114 S.Ct. 1677, 1682, 128 L.Ed.2d 399; *see also Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (North Carolina produce labeling statute struck because it had the practical effect of discriminating against competing Washington apples to the benefit of local producers); *Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978) (Wisconsin statute regulating the length of trucks operating on state highways struck down because it had the effect of discriminating in favor of Wisconsin businesses to the detriment of out-of-state ones).[8]

In contrast, the Ordinance challenged in this case regulates evenhandedly in addressing a matter of local concern and, consequently, poses only incidental burdens on interstate commerce. *See, e.g., Hass,* 883 F.2d at 1462; *Camille Corp. v. Phares,* 705

F.2d 223, 229 (7th Cir.1983). Some recent case law suggests that a court's commerce clause analysis should end once it concludes that the challenged legislation impacts intrastate and interstate commerce identically and the particular means chosen to achieve the legislation's goals are not wholly arbitrary. *See, e.g., Pacific Northwest Venison Producers v. Smitch,* 20 F.3d 1008, 1014 (9th Cir. 1994) (*"PNVP"*) (legislation that does not fall more heavily on interstate commerce is "arguably ... not subject to invalidation under the commerce clause"); *New York State Trawlers Ass'n v. Jorling,* 16 F.3d 1303, 1308 (2d Cir.1994) (" 'Incidental burdens' are the burdens on interstate commerce that exceed the burdens on intrastate commerce."); *Old Bridge Chem., Inc. v. New Jersey Dep't of Envtl. Protection,* 965 F.2d 1287, 1295 (3rd Cir.1992) (only discriminatory burdens are considered in the *Pike* balancing test), *cert. denied,* —— U.S. ——, 113 S.Ct. 602, 121 L.Ed.2d 538 (1992).

The greater weight of legal authority, however, dictates further analysis by this Court to ascertain whether the burden the Ordinance imposes on interstate commerce is "clearly excessive in relation to the putative local benefits." *Pike,* 397 U.S. at 142, 90 S.Ct. at 847; *see also Hispanic Taco Vendors of Wash. v. City of Pasco,* 994 F.2d 676, 679 (9th Cir.1993); *PNVP,* 20 F.3d at 1015. At the same time, however, the Court approaches this part of the analysis mindful of the Supreme Court's warning that it is inappropriate for a court to " 'second-guess the empirical judgments of lawmakers concerning the utility of legislation....' " *CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 92, 107 S.Ct. 1637, 1651, 95 L.Ed.2d 67 (1987) (quoting *Kassel v. Consol. Freightways Corp.,* 450 U.S. 662, 669, 101 S.Ct. 1309, 1315–16, 67 L.Ed.2d 580 (1981) (Brennan, J., concurring)).

*1. Burdens Imposed by the Ordinance*

First, it is useful to begin this discussion by reviewing what retailers must do to comply with the Ordinance. Although the Ordi-

---

**8.** "The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 126, 98 S.Ct. 2207, 2214, 57 L.Ed.2d 91 (1978).

nance is colloquially referred to as a "lock-up" law, nothing in its provisions requires retailers to actually lock-up their spray paint and markers. Rather, the Ordinance requires retailers to display these products so that they cannot be accessed by the public without employee assistance.

Many methods of display satisfy this requirement. For example, a retailer could move spray paint behind the cash register, or leave it in its present location, but secure it, or display empty "dummy" cans of spray paint and indicate to customers that once they have selected a particular item, an employee will retrieve it from storage or a locked case. At trial, several retailers testified that they already display many items in a manner that requires employee assistance before a customer can make a purchase. (Tr. (EG) 75:1–8; Tr. (JT) 28:2–19; Curtin Decl. ¶ 3; Cornell Decl. ¶ 10). Indeed, one of plaintiffs' witnesses, Joseph Totah, a hardware store owner in the City, testified that 80% of his customers require some type of assistance when shopping in his store.

### a. *Plaintiffs' Witnesses*

Plaintiffs presented six primary witnesses to discuss the expected burdens that the Ordinance would impose on manufacturers and retailers of spray paint and markers. The Court has disregarded the testimony of three of the witnesses because it was largely speculative in nature or based on flawed data.[9]

The Court finds the testimony of the remaining plaintiffs' witnesses equally unreliable. For example, plaintiffs presented Joseph Scaminace, President and General Manager of Sherwin–Williams' Speciality Division—the division that produces spray paint. The centerpiece of Mr. Scaminace's testimony was Exhibit 157A which contained 1992 and 1993 annual figures for Sherwin–

Williams' sale of spray paint to Home Depot and Home Base stores in California cities with lock-up laws. The totals showed a decline in overall sales to both chains of about 22 to 25%. Scaminace attributed this decline to the lock-up laws in effect in those cities and further estimated that, because most of the laws did not go into effect until mid–1993, an annual decline of 50% can be expected. (Tr. (JS) 17:3–19; 21:10–24).

There are numerous problems with Exhibit 157A and, consequently, Mr. Scaminace's testimony. First, Scaminace had no personal knowledge of the figures contained in the document. Rather, the document was produced by his subordinates who did not provide the underlying data either to Scaminace or to the City despite its repeated requests and in violation of Rule 1006 of the Federal Rules of Evidence. (Tr. (JS) 8:20–11:13).

In addition, because he was unable to inform the Court of the precise months in 1993 that the various lock-up laws went into effect and because sales were not broken down by month, it is impossible to determine whether the decline in 1993 sales occurred before or after lock-up. (Tr. (JS) 13:122–25; 31:17–33:1).

Next, Mr. Scaminace admitted during cross-examination that in 1993, Home Depot eliminated a low-priced line of Sherwin–Williams' spray paint, but Sherwin–Williams had not adjusted its 1993 sales figures to account for this loss. (Tr. (JS) 31:3–10). Finally, Mr. Scaminace admitted that he did not make any adjustments in his figures to account for the possibility that theft has been reduced as a result of lock-up. (Tr. (JS) 37:2–8).[10]

Next, plaintiffs presented Joseph Totah. Mr. Totah owns three hardware stores in San Francisco and experienced a significant problem with spray paint theft at one of them. In response, in mid-September 1993,

---

**9.** Specifically, the Court disregards the testimony of Charles Goodman and David Davis because it was wholly speculative in nature. Further, it dismisses the testimony of Stephen Ste. Marie regarding the Ordinance's impact on jobs and tax revenues in the City because it was predicated on figures provided to him by plaintiffs' counsel that were shown to be flawed during cross-examination.

**10.** Mr. Scaminace also conceded that despite his conviction that lock-up laws will devastate the spray paint industry, he has never talked to a California retailer operating under a lock-up law to ascertain his or her view on the actual impact. (Tr. (JS) 39:13–21).

he moved his spray paint in that store to the top shelf where it could not be accessed without employee assistance. He testified that this resolved the theft problem, but also resulted in a 50% reduction in the amount of spray paint he ordered from manufacturers. (Tr. (JT) 18:24–19:24). He anticipates a similar decline at his other two stores if the Ordinance takes effect.

To support his conclusion, plaintiffs introduced Exhibit 144, a series of twelve invoices from Ideal Paint—one of Mr. Totah's two suppliers of spray paint. The exhibit revealed numerous flaws in Mr. Totah's testimony. For example, it demonstrated that his testimony (1) was based on orders from only one of two suppliers, (2) covered only a three-month post-move period, (3) did not compare the sales figures for those three months with the same three months of the prior year, and (4) did not take into account the fact that the move had eliminated his losses due to theft which he testified added up to almost two cases of paint a month. (Tr. (JT) 30:10–19; 32:11–24; 33:6–11; 35:4–7). All of these shortcomings severely undermined plaintiffs' proffered conclusion that locking-up spray paint will reduce sales by 50%.

Finally, plaintiffs presented the testimony of Ernest Gentner, the owner of Center Hardware in San Francisco. Mr. Gentner testified that he expects his spray paint sales to decline dramatically—by at least 50%—if the Ordinance goes into effect. (Tr. (EG) 68:20–69:16). He testified that he plans to move his spray paint stock to the mezzanine level, which is inaccessible to the public, because he is unwilling to pay the $7,000 that one company gave as an estimate for him to lock-up his displays. (Tr. (EG) 66:15–21).

Mr. Gentner based the 50% drop in sales on the experience he had when the VOC law

went into effect in San Francisco.[11] To comply with that law, he moved his spray paint onto the mezzanine, which is inaccessible to the public, and his sales declined dramatically. As a result, he anticipates that the same thing will happen when he moves his spray paint to the same location to comply with the Ordinance. (Tr. (EG) 68:20–69:16). This conclusion is flawed for two reasons. First, it was unclear from his testimony whether Mr. Gentner's sales dropped after the VOC law went into effect because of the location of the paint or because he had no product to sell that complied with the new regulation. (Tr. (EG) 68:20–69:13). Second, the Ordinance does not require retailers to move their paint stock entirely off the sales floor. Obviously, this is a drastic measure and will have a more significant impact on sales than simply locking-up paint or displaying dummy cans for customer inspection.

b. *The City's Witnesses*

The City presented two retailers currently operating under lock-up to directly contradict the predictions made by plaintiffs' witnesses.[12]

First, the City presented Kim Curtin, the Merchandiser for Department 24 for all Home Depot's stores in its Western Division. Department 24 includes spray paint. Home Depot voluntarily decided to lock-up its spray paint in March 1993, prior to enactment of several lock-up laws in Southern California, because customers were encouraging it to do so. (Curtin Decl. ¶ 6). Approximately 77 of the 92 stores in Home Depot's western division are now locked-up.

Prior to implementing the lock-up, Curtin conducted a systematic review of the profitability of all spray paint products and decided to eliminate several lines.[13] Curtin admits that she advised many of her stores to re-

11. The VOC—Volatile Organic Compound—is an air quality regulation that restricts the amount of pollutants contained in spray paint.

12. The Court observes that despite the fact that both plaintiff Sherwin–Williams and plaintiff Tru–Test have retail outlets located in California towns with lock-up laws, neither took the opportunity to present the experiences of their retailers to the Court either through live testimony or via a written declaration.

13. Although plaintiffs maintain that Curtin's decision to eliminate several lines of spray paint forebodes similar decisions by retailers in San Francisco, there was no evidence to indicate that Curtin's decision was based on the lock-up. Indeed, Ms. Curtin's testimony on this issue was directly to the contrary.

duce the total amount of linear feet of shelving dedicated to spray paint display, from three shelving bays to two, anticipating that the lock-up measure would result in decreased sales. (Curtin Decl. ¶ 13).

Despite her initial concern, however, Curtin stated that the lock-up has not harmed the profitability of spray paint in Home Depot stores. (Curtin Decl. ¶ 16). Although she conceded that it is difficult to isolate effects resulting from the lock-up, Curtin maintains that she has watched sales "like a hawk" and believes spray paint sales have increased in many stores and markets compared to the same months in the year prior to lock-up. (Curtin Decl. ¶ 17). Because of the continued profitability of spray paint, Curtin is now working with several stores to increase the number of shelving bays back to three. (Id.). She notes that she has not received many customer complaints regarding having to wait for employee assistance to get access to spray paint.[14] (Curtin Decl. ¶¶ 14, 15). She concludes that, although paint sales have probably decreased in some stores, Home Depot has never "seriously considered" reversing its decision to lock-up paint. (Curtin Decl. ¶ 18; Curtin Dep. 65:24–66:4).

Next, the City offered the testimony of Brett Thomson, owner of an independent hardware store in Glendale, California. Thomson locked-up his paint in September 1989, over a year before Glendale's law went into effect. He testified that he locked-up in advance of the law in part because he had had a problem with spray paint theft and juveniles loitering in his store. (Thomson Dep. 22:21–23:8).

Thomson testified that it only cost $500 in materials and labor to lock-up his spray paint behind cages constructed with chicken wire, wood and plexiglass.[15] (Thomson Dep. 25:1–24). He further testified that he was not required to reduce the number of linear feet dedicated to spray paint or rearrange his floor layout. (Thomson Dep. 27:18–27:11). Most importantly, he testified that he has been "quite happy with the result. And ... didn't suffer any reduction in sales." (Thomson Dep. 23:22–23).[16]

In sum, the evidence concerning the anticipated burdens of the Ordinance on interstate commerce indicated that although some reduction in sales may result, the industry's prediction of a 50% decline is entirely incredible.

### 2. Putative Local Benefits

The other side of the *Pike* balancing test requires the Court to assess the "putative" local benefits of the challenged legislation.

■ To begin with, it is without question that San Francisco has a significant problem with graffiti vandalism. In the current fiscal year, the City will spend millions of dollars for graffiti abatement and removal. (Conroy Decl. ¶ 14). In addition, private property owners, public utilities and other entities spend millions more in eradication efforts. A brief walk through any neighborhood in San Francisco reveals that almost every available surface—from sign posts to utility boxes, curbstones to alleyways, building walls to storefront windows—has been defaced by graffiti. Legislation that seeks to prevent graffiti vandalism serves a legitimate public interest. (SUF ¶ 8). *National Paint &*

---

**14.** This testimony contrasted sharply with the testimony of one of plaintiffs' witnesses who predicted that, rather than wait for employee assistance, his customers would likely drive to nearby suburbs to purchase their spray paint from unlocked displays. (Goodman Trial Testimony).

**15.** This figure contrasted sharply with the estimated $7,000 that one of the plaintiffs' witnesses was told it would cost to lock-up his spray paint display.

**16.** The Court acknowledges plaintiffs' objections to Thomson's testimony based on his refusal to make his sales information available to plaintiffs

for review. Thomson argued strenuously that he should not have to produce this data to one of the industry's largest manufacturers because it constituted confidential proprietary information that could expose him to retaliation. The Court concludes that because Thomson's testimony is based on his personal observation of sales history in his store, his failure to produce verifiable figures simply affects the weight his testimony should be afforded but does not require its exclusion. In addition, the Court can think of no reason why Mr. Thomson would benefit from misrepresenting the impact that Glendale's lock-up law has had on his spray paint sales.

*Coatings Ass'n v. City of Chicago,* 803 F.Supp. 135, 142–43 (N.D.Ill.1992); *see also Miller v. Board of Public Works,* 195 Cal. 477, 234 P. 381, 383 (1925).

In addition, and as outlined in great detail above, although the Ordinance may not deter the most committed graffiti vandals, the evidence suggests that it may very well frustrate the efforts of less committed taggers. Even two of plaintiffs' own witnesses conceded that the Ordinance could persuade some taggers to give up their habit. (Tr. (S–J) 56:18–57:3; Mann Dep. 108:19–109:10). This prediction was supported by Gardena's experience with its lock-up law. Ms. Araki testified that she witnessed a substantial and immediate reduction in graffiti in her neighborhood after spray paint sales were banned at a nearby swap meet, and another substantial and immediate reduction after the local Home Depot locked-up its spray paint. (Araki Decl. ¶¶ 7, 8). Detective Mulroney, of the Gardena Police Department, confirmed Ms. Araki's experience through conversations with local taggers who told him that they tag less as a result of the lock-up. (Mulroney Decl. ¶ 16). Plaintiffs presented no evidence to the contrary.[17]

As a whole then, the evidence supports the conclusion that the City can expect to reap actual benefits from the Ordinance in the form of deterrence. The benefits derived from the Ordinance will be enhanced by the fact that it will take effect at a time when the City is actively pursuing several other graffiti-fighting measures, including the use of "rolling paint shops" for quick remediation and greater coordination between various City departments to streamline remediation program. (Conroy Decl. ¶¶ 11, 12, 13). In addition, unlike other common measures, the Ordinance constitutes one of the few graffiti fighting tactics that is preventative in nature; that is, it works to keep graffiti tools out of the hands' of vandals and, therefore, prevents graffiti before it is produced, rather than concentrating on its abatement and removal. In light of these very real advantages, the Court cannot conclude that the minimal burden that the Ordinance places on interstate commerce is "clearly excessive" in relation to its "putative local benefits."[18]

## B.

### THE CITY'S POLICE POWER

█  Next, plaintiffs maintain that the Ordinance constitutes an improper exercise of the City's police power. Under Article 11, Section 7 of the California Constitution, legislation violates the police power if it does not bear a reasonable relationship to its objectives or the means adopted by the legislation are not reasonably necessary for accomplish-

---

**17.** Plaintiffs presented one witness, Jay Beswick, via written testimony who stated that in reviewing cities with lock-up laws, he has witnessed a significant increase in glass etching—a more destructive form of graffiti vandalism. (Beswick Dep. 282:15–283:10). His testimony on this point was largely unsupported and was directly contradicted by (1) the testimony of Mr. Brewer who stated that glass etching was more common in San Francisco than in Southern California where many cities have lock-up laws, (2) Mr. Engel, Glendale's City Administrator, who testified that glass etching in Glendale has not increased since the implementation of that city's lock-up law, and (3) Detective Mulroney who testified that he has not seen a noticeable increase in other types of graffiti since Gardena's lock-up law took effect. (Tr. (DB) 41:12–42:3; Engel Decl. ¶ 17; Mulroney Decl. ¶ 17). In addition, the Court notes that two-thirds of Mr. Beswick's income is derived from paint manufacturers. (Beswick Dep. 96:13–21, 300:22–25).

**18.** In so concluding, the Court rejects the ruling that Judge Aspen made in a similar case presented to him in the Northern District of Illinois. It is worth noting, however, that the facts presented to Judge Aspen differed from those involved here in three important respects. First, the regulation at issue in the Chicago case mandated a complete ban on the sale of spray paint and markers within that city's limits. Obviously, the burdens imposed on interstate commerce by a complete ban are considerably more significant than those presented by the lock-up provision at issue here. Second, a review of Judge Aspen's opinion indicates that, unlike this case, he was not presented with any evidence regarding the results similar ordinances have had in towns operating under them. Finally, Judge Aspen accepted the paint manufacturers' prediction that a ban would have absolutely no deterrent effect on graffiti vandals because of their level of commitment. As noted in detail above, this Court finds that although this conclusion may be applicable to dedicated taggers, it is not applicable to all of them. *National Paint & Coatings Assoc. v. City of Chicago,* 835 F.Supp. 421 (N.D.Ill.1993).

ing these objectives. *McKay Jewelers, Inc. v. Bowron*, 19 Cal.2d 595, 122 P.2d 543, 546 (1942); *Paraco, Inc. v. Department of Agriculture*, 118 Cal.App.2d 348, 257 P.2d 981, 984 (1953).

In considering a challenge to a city's police power, however, it is

> well settled ... that the determination of the necessity and form of ... regulations ... is primarily a legislative and not a judicial function, and is to be tested in the courts not by what the judges individually or collectively may think ..., but solely by the answer to the question is there any reasonable basis in fact to support the legislative determination of the regulation's wisdom and necessity?

*Consolidated Rock Prod. Co. v. City of Los Angeles*, 57 Cal.2d 515, 20 Cal.Rptr. 638, 370 P.2d 342, 346 (1962). As a result of this principle, the police power is extremely broad and may not be limited lightly. *Id.; Miller*, 234 P. 381. Indeed, the California Supreme Court has warned that "[t]he courts may differ with the legislature as to the wisdom ... of a particular enactment as a means of accomplishing a particular end, but as long as there are considerations of ... general welfare which the legislative body may have had in mind, which have justified the regulation, it must be assumed by the court that the legislative body had those considerations in mind and that the considerations did justify the regulation." *Miller*, 234 P. at 385–86.

The Ordinance is neither an unreasonable nor an arbitrary exercise of the City's police power. Rather, it bears a reasonable relationship to its objective of reducing graffiti by making two of the implements most commonly used to commit graffiti and most frequently stolen less susceptible to theft. It was not unreasonable for the Board of Supervisors to conclude that a reduction in the theft of these items would have a corresponding reduction in the amount of graffiti produced.

## C.

### EQUAL PROTECTION

In considering an equal protection challenge to a piece of legislation, a court must make two preliminary determinations. First, it must identify the legislative body's classification of groups. *Madarang v. Bermudes*, 889 F.2d 251, 253 (9th Cir.1989), *cert. denied*, 498 U.S. 814, 111 S.Ct. 54, 112 L.Ed.2d 29 (1990). Next, it must identify the level of scrutiny applicable to such a classification. *Id.*

The Ordinance imposes obligations upon "any person who owns, conducts, operates or manages a retail commercial establishment where aerosol paint containers or marker pens are sold." Police Code § 4201(a). Thus, on its face, the Ordinance does not create any suspect classifications.

Because the Ordinance does not deprive plaintiffs of a fundamental right or classify along suspect lines, such as race, it must be upheld if it is rationally related to a legitimate end. *See Burlington N.R. Co. v. Ford*, — U.S. —, —, 112 S.Ct. 2184, 2186, 119 L.Ed.2d 432 (1992); *see also Madarang*, 889 F.2d at 253 ("[I]n the area of economics and social welfare, legislative classification satisfies the requirements of equal protection if it has some reasonable basis and if any state of facts can be conceived to justify it.") (citation omitted). Under the rational relationship standard, legislative bodies "are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude." *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (per curiam). The requirements of the Ordinance are rationally related to the City's legitimate interest in reducing graffiti because they deter theft of the implements most favored by graffiti offenders.

In addition, the plaintiffs' contention that the Ordinance is underinclusive because it does not restrict access to alternative products that may be used to create graffiti is also flawed. The Supreme Court has held that "a legislature need not 'strike at all evils at the same time or in the same way.'" *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1981) (quoting *Semler v. Oregon State*

*Board of Dental Examiners,* 294 U.S. 608, 610, 55 S.Ct. 570, 571, 79 L.Ed. 1086 (1935)). Rather, "a legislature 'may implement [its] program step by step, ... adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.'" *Id.* (quoting *New Orleans v. Dukes,* 427 U.S. at 303–04, 96 S.Ct. at 2516–17). In drafting anti-graffiti legislation, there was nothing irrational about the Board of Supervisors' decision to focus its energies on the most commonly used graffiti implements, rather than striking out at once at all of the available substitutes.

## D.

### SUBSTANTIVE DUE PROCESS

Courts entertaining substantive due process challenges employ a "highly deferential standard [that] is functionally equivalent to the rational basis test in equal protection law." *Munoz v. Sullivan,* 930 F.2d 1400, 1404 n. 10 (9th Cir.1991). Moreover, "rational basis scrutiny simply does not require that legislation which furthers one [legislative] goal have no adverse side effects." *Id.* at 1405.

■■■ In considering an ordinance's conformity with substantive due process, courts must refrain from examining its effectiveness. *Levald, Inc. v. City of Palm Desert,* 998 F.2d 680 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 924, 127 L.Ed.2d 217 (1994). Rather, the Ninth Circuit has cautioned

> [t]here is no requirement that the statute actually advance its stated purpose; rather, the inquiry focuses on whether "the governmental body **could have had no legitimate reason** for its decision." [In addition], "the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it **might be thought** that the particular legislative measure was a rational way to correct it."

*Id.* at 690 (emphasis added) (quoting *Williamson v. Lee Optical of Oklahoma,* 348

U.S. 483, 487–88, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955)) (other citations omitted).

■■■ Under this test, even if the Ordinance is not completely effective in achieving its purpose of preventing the theft of popular graffiti implements and, consequently, reducing graffiti, it still satisfies substantive due process because the Board could have rationally concluded that the Ordinance would accomplish these goals.

## E.

### OVERBREADTH/VAGUENESS

Finally, the plaintiffs maintain that the Ordinance is unconstitutionally overbroad and vague. The Supreme Court has advised that when faced with such a challenge:

> a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. The court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications.

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494–95, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982) (footnotes omitted).

■■■ The plaintiffs' overbreadth challenge is without merit because the doctrine only applies to expression protected under the First Amendment. *Id.* at 495, 102 S.Ct. at 1191–92. *See also Massachusetts v. Oakes,* 491 U.S. 576, 581, 109 S.Ct. 2633, 2637, 105 L.Ed.2d 493 (1989); *Grayned v. City of Rockford,* 408 U.S. 104, 114–115, 92 S.Ct. 2294, 2302–03, 33 L.Ed.2d 222 (1972). The only activity impacted by the Ordinance is the commercial display and sale of spray paint and markers. This type of retail restriction does not implicate speech or expressive conduct. In contrast, the Ordinance places no restrictions on the subsequent use of these items, which may or may not involve conduct protected by the First Amendment. *See Hoffman Estates,* 455 U.S. at 496, 102 S.Ct. at 1192 (rejecting overbreadth challenge to a regulation implicating "the attenu-

ated interest in displaying and marketing merchandise in the manner a retailer desires").

Lastly, plaintiffs urge that the Ordinance defines the terms "aerosol paint container" and "marker pen" in an impermissibly vague manner.[19] Due process, however, only requires that the law is stated "in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with." *Civil Service Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 579, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973). In addition, because the Ordinance does not implicate any constitutionally protected conduct, it must be upheld unless it "is impermissibly vague in all of applications." *Hoffman Estates,* 455 U.S. at 494–95, 102 S.Ct. at 1191–92; *see also IDK, Inc. v. Clark County,* 836 F.2d 1185, 1198 (9th Cir.1988).

■ The plaintiffs presented no evidence concerning the purported difficulties a retailer might encounter attempting to construe the Ordinance. A review of its language and, in particular, the narrow definitions ascribed to the terms "aerosol paint container" and "marker pen," reveals that a retailer exercising common sense will know which items fall within the Ordinance's scope. Finally, the Supreme Court has held that "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Hoffman Estates,* 455 U.S. at 495, 102 S.Ct. at 1191–92. Given the fact that the plaintiffs identified themselves as manufacturers and retailers of items defined in the Ordinance, they lack standing to raise a vagueness challenge.

Accordingly,

**IT IS HEREBY ORDERED** that the plaintiffs' motion for a permanent injunction is **DENIED** and the order granting the preliminary injunction is **VACATED.**

---

**19.** The Ordinance defines "aerosol paint container" as "any aerosol container, regardless of the material from which it is made, which is adapted or made for the purpose of spraying paint capable of defacing property." Police Code § 4200(a). It defines "marker pen" as "any indelible marker or similar implement with a writing tip exceeding (4) millimeters in width that contains a solution that cannot be removed with water after it dries." Police Code § 4200(b).